Eliza Byard, appellant,

*v.*

Kate Conover, respondent.

A bachelor, seventy-two years old, while in a moribund condition, signed a
paper purporting to be his will, and giving all of his property to his house-
keeper, who had lived with him for many years. The paper had been prepared
by her four years before, and she testified that he had put off executing it,
although meanwhile frequently requested by her to do so. On the day when
he signed it, she sent for the witnesses, told the attending physician that if the

Byard v. Conover.

testator was not going to live, she wanted to have a paper signed. None of the testator's brothers and sisters was present, or informed of the making of the will, although one brother lived in the adjoining house. To one of the witnesses, in reply to a remark that they had come to witness his will and supposed he knew all about it, he replied that he did not know anything about it. The evidence as to his intentions in disposing of his property was conflicting.— *Held*, that the paper should be refused probate, on the ground of want of capacity and undue influence.

Appeal from decree of Salem orphans court, submitted on stipulation and briefs of counsel.

*Mr. W. T. Hilliard*, for appellant.

*Mr. A. H. Slape*, for respondent.

The Ordinary.

This is an appeal from a decree of the orphans court of Salem county, refusing to admit to probate an instrument of writing purporting to be the will of Stephen Willis, deceased, late of the county of Salem. The testator was a bachelor of about seventy-two years of age. By the will he gives $5 to each of his four sisters and two brothers, and then gives all the residue to Eliza Byard, his housekeeper, absolutely. She had been his housekeeper for many years. The will was signed when he was *in extremis*. He signed it at about half-past four in the afternoon, and died at about a quarter to seven in the evening of the same day. The witnesses were his physician, Dr. Patterson, and George R. Morrison, surrogate of the county. The testator was in a dying condition at the time. Dr. Patterson made a professional visit to him in the morning of the day and found him extremely ill, without perceptible pulse either at the wrist or temples, and his flesh cold. He called again at noon and found him in no better state. He came again at four o'clock in the afternoon and his condition was no better; he was nearing his end. It is very doubtful, to say the least of it, whether he had sufficient capacity to execute a will at that time. He appears not to have had the physical strength to make his mark to the instrument. It was made by Mr. Morrison's clasping the testator's hand holding the

pen, in his own, and guiding it in making the mark. The testator was too weak to rise or to be raised in bed. Mr. Morrison says he hardly thinks the testator could have made the mark without assistance, and that they both together made the mark somehow. He further says that he is satisfied that the testator " intended to make the mark, at any rate." Dr. Patterson says the testator did it " in a way as if he did not seem to care." He also says he thought Mr. Morrison made some exertion to have him make his mark. The proponent requested Dr. Patterson, at his visit at noon, to bring Mr. Morrison with him at four o'clock, but he declined to do it. In answer to the question whether he would have signed the will as a witness if he had not considered that the testator was in a condition to know what he was doing, he answered that when the will was signed he was not very well satisfied with the testator's signing it; that he did not " feel entirely satisfied that he was able to execute it "—that is, that he was not satisfied that he had the requisite mental capacity. The testimony of Mr. Morrison does not establish the testator's testamentary competency. The testator, neither by word nor deed, expressed any desire to make a will. The proof is that it was the proponent and not he who wanted to have it made. She said to Dr. Patterson at noon that if the testator was not going to live she wanted to have a paper signed, and she asked him, as before stated, to bring Mr. Morrison with him at four in the afternoon, but he declined to do so. It was she who sent for Mr. Morrison. When Mr. Morrison came there she told him that the testator wanted to make a will. He set about making preparations to draw one, and she said she had one written and then handed him a paper—the one which was subsequently signed—saying that the testator knew its contents. Mr. Morrison showed the paper to the testator and asked him if he knew its contents, and he said he did. Mr. Morrison then said that there was no executor named in the will. The testator said he did not know whom to make executor, and asked how a gentleman whom he named would do, to which Mr. Morrison replied that he thought that gentleman would not care to attend to it. Mr. Morrison says the testator then did not seem to know whom

Byard *v.* Conover.

to name; that either the testator or the proponent suggested that he should act, but he declined, and proposed that the proponent should be appointed, to which, he says, the testator "assented—seemed to agree to it." Mr. Morrison took the paper from the room to insert a clause appointing the proponent executrix and to fill in the dates. While he was gone, Dr. Patterson said to the testator that they had come to witness his will, and said he supposed the testator knew all about it, to which the latter replied that he did not know anything about it. Dr. Patterson went into the room in which Mr. Morrison was and told him this, and the latter said the testator should know about it. Mr. Morrison says he read the will over to the testator, who seemed satisfied with it. He also says that, after the will had been signed, he asked the testator whether that was just the way he wanted to leave his property, and the testator said, in substance, that that was the best he could do with it. The testator was in a moribund condition. Dr. Patterson knew he was very near his end. He himself knew it. He said he wanted to die and go to heaven. His physical powers had so failed that he had no perceptible pulse and his flesh was cold. He was too weak to be lifted up to make his mark, and it is very doubtful whether he had strength to make his mark. Mr. Morrison, as before stated, says the testator did it, or "intended to do it." The mark was probably made by Mr. Morrison holding and moving the testator's hand in his own. He expressed no desire to make a will. He gave no instructions for any. To Dr. Patterson he said he knew nothing about it. The doctor says the greatest number of words he uttered was when he said that that was the best he could do. The proponent drew the will. She says she drew it four years before that time, and had it copied by her niece, Mrs. Scott. She says she asked Mrs. Scott's son to draw it, but he refused, and then she drew it and got his mother to copy it; that Mrs. Scott kept it until two weeks before the testator's death, when she (proponent) got it and took it home and read it to him. She says he was anxious to sign it, and on the day of his death requested her to send for Mr. Morrison, and she did so. But this does not accord with her statement that the testator

kept putting off signing it, nor with her application to Dr. Patterson to get him to bring Mr. Morrison, for she said she (not the testator) wanted it signed if the testator was going to die. Nor does it agree with the testator's statement to the doctor that he knew nothing about it. Though the testator's brother lived in the next house, neither he nor any of his family was informed of the proposed making of the will, nor were any of the testator's numerous brothers and sisters. The proponent is called his housekeeper. He was a day laborer. She appears to have lived in the house with him, indeed, and to have served him as a housekeeper, but merely in consideration of her having a home there. She was to have no wages and was to support herself. She says she went out to work at washing, scrubbing, or ironing, or anything she could get to do. There were no relations between them to give her any claim upon his bounty or his sense of justice. She had a child when she went there, and appears to have wanted a home. It is true there is evidence that he said he would not give his family anything, and would give his property to her, but that was said, one witness says, "as much as ten years and as late as six ago." The proponent says he said so to her four years before his death. There is also evidence, on the other hand, that he said he intended to give his property to his brothers and sisters, or some or one of them. As to what his intentions on the subject were, up to the time of the making of the will, there is no evidence, except the testimony of the proponent, and against that stand the facts that the testator had not executed the paper she prepared for him, but for four years had, as she says, kept putting it off; that she had no claims upon him; that he was not only not desirous of signing the paper when it was produced for signature, but said he knew nothing about it. The circumstances of the execution of the will are such as to lead to the conclusion that, whatever might have been his intentions, when in health, as to the testamentary disposition of his property, the paper propounded cannot be regarded as the testator's will, but rather as that of the proponent. I am of opinion, too, that the testator had not testamentary capacity. The decree appealed from will be affirmed.